# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**TODD ANDREW STRATTON,**

**Plaintiff,**

-vs-                                                    Case No.  6:08-cv-1490-Orl-31KRS

**COMMISSIONER OF SOCIAL
SECURITY,**

**Defendant.**

_____

# REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the Complaint filed by Todd A. Stratton, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. Nos. 10, 12.

## I.    PROCEDURAL  HISTORY.

The ALJ reported that Stratton applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq.* (sometimes referred to herein as the Act),  R. 18, but the applications are not before the Court. The ALJ indicated that Stratton alleged that he became

disabled on February 21, 2005. *Id.* Stratton's applications were denied initially and on reconsideration. R. 18, 36-37, 41-47.

Stratton requested a hearing before an administrative law judge (ALJ). R. 39. An ALJ held a hearing on September 18, 2007. Stratton, who was not represented[1], testified at the hearing. R. 460-82. Paul Dolan, a vocational expert (VE), also testified. R. 482-86.

After considering the testimony and the medical evidence presented, the ALJ determined that Stratton was insured under OASDI through December 31, 2011. R. 22. The ALJ found that Stratton had not engaged in substantial gainful activity since February 21, 2005, the alleged onset date of his disability. R. 23; *see also* R. 76. Stratton continued to work in 2005 and 2006, but his earnings were below substantial gainful activity levels. R. 23.

The ALJ concluded that the medical evidence showed that Stratton had the following severe impairments: (1) cervical and lumbar degenerative disc disease; (2) degenerative joint disease of the knees, status post multiple bilateral knee surgeries; (3) history of childhood radiation and chemotherapy, with related liver problems; (4) headaches; (5) obesity; (6) gastrointestinal reflux disease; and (7) history of bipolar disorder. R. 24. These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[2] R. 28.

---

[1] Stratton does not contend that his waiver of the right to representation was not valid.

[2] The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d

The ALJ found that Stratton had the residual functional capacity (RFC) to perform a substantial range of light work.[3] Specifically, he could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds or less; sit and stand/walk for up to 6 hours in an 8-hour day with normal breaks; occasionally perform push/pull functions with his extremities; climb stairs and ramps but not ropes, ladders, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; and was capable of appropriate interaction within the workplace. R. 30. In reaching this conclusion, the ALJ gave some weight to all of the medical source opinions, but gave greater weight to the reports and opinions of Drs. Barber, Corak, Gallardo and Patel. The ALJ found Stratton's testimony about the limitations arising from his impairments was not credible to the extent that it was inconsistent with the ALJ's RFC assessment. R. 32.

The ALJ found that Stratton was capable of performing his past relevant work as a technical supply specialist, DOT Number 033.162-018, sedentary work with an SVP of 7[4];

---

1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

[3] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b); 20 C.F.R. § 416.967(b).

[4] Specific Vocational Preparation (SVP) refers to "[t]he amount of time required to learn the techniques, acquire information, and develop the facility needed for average performance in a specific job-worker situation." SSA, DI 25001.001; U.S. Emp. Svc., *Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles* (SCO) 472. An SVP of 7 corresponds to a period between over two years and four years. *Id.* An SVP of 4 corresponds to a period between over 3 months and 6 months. *Id.*

programmer analyst, DOT Number 030.162-014, sedentary work with an SVP of 7; and sales clerk, DOT Number 290.477-014, light work with an SVP of 4. R. 34. Therefore, the ALJ concluded that Stratton was not disabled. R. 35.

Stratton requested review of the ALJ's decision. R. 14. On June 27, 2008, the Appeals Council issued a decision finding no basis to review the ALJ's decision. R. 4-6. Stratton timely sought review of this decision by this Court. Doc. No. 1.

## II.    JURISDICTION.

Plaintiff having exhausted his administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.    STATEMENT OF FACTS.

### A.    Stratton's Testimony and Written Statements.

Stratton was born in 1978. R. 465. At the time of the hearing, he was 5'10" tall and weighed 240 pounds. R. 479. He completed school through the eighth grade. R. 465-66. Stratton had also completed vocational training for graphic design. R. 466-67.

At the time of the hearing, Stratton had been working for Walmart for two years as an electronics sales associate. *See, e.g.,* R. 67 (earnings report). Walmart adjusted Stratton's job requirements so that he was not required to lift anything. R. 468-69. During the year before the hearing, Stratton worked 20 hours per week, approximately 7 hours per day, which was reduced from 32 hours a week he worked the previous year. R. 467-68, 470-71. He worked 3 consecutive days, then had 4 consecutive days off. Walmart would prefer that

Stratton work more hours, but he chose to only work 20 hours.  R. 467-68.  Stratton testified that if he worked more than 20 hours per week, he would have to go to the emergency room for infections or bronchitis.  R. 468.  He had to sleep for two days after working to recover from the physical demands of the job.  R. 470.

Before he worked at Walmart, he worked as a technologies coordinator, providing technical support for point of sale for Western Outfitters.  He was a liaison between the stores and technical support.  He resigned because he could not physically work 40 hours per week.  R. 471.  He became sick more often, ended up in the emergency room, and could not get out of bed due to physical exhaustion and pain.  He was told that he would be fired because he was missing too much work. R. 472.

Before these jobs, Stratton worked as a web designer.  R. 472; *see also* R. 103-05.

Stratton reported suffering from back pain due to spinal compression, which also caused pain in all of his extremities.  R. 472.  It caused neck problems, as well as problems controlling his legs and arms.  R. 472-73.  He was not able to hold a cup of coffee because he would drop it.  He had insufficient sensation in his arms, hands, and feet, and he had injured himself without knowing it.  His back pain caused extreme exhaustion; he could not shave or brush his teeth without having to sit down and take a break.  His back pain also caused headaches and migraine headaches.  The migraines caused blindness.  R. 473. He had lost 50% of the vision in his left eye.  R. 479-80.  Stratton also felt he was depressed. R. 474-75.

Ultracet (a prescription medication for pain) helped his neck and back pain and headaches "a little bit." R. 475. He was trying Oxycodone (a prescription narcotic pain reliever) in place of Ultracet. R. 475-76. He was not taking medication for his mental condition because he had not always been able to afford the medication. R. 476. When he could afford the medication, it helped him to sleep and to stop thinking about suicide. R. 477-78. He did not have side effects from his medications. R. 480.

Stratton testified he had erosion in his esophagus because he threw up every morning. He was also being tested for irritable bowel syndrome due to problems with diarrhea. R. 478-79.

Stratton drove himself to the hearing and drove to work 25 minutes each way. R. 480-81. Stratton no longer attended church, and had difficulty going out with friends because he could not stand for long periods and the seating was not "proper." R. 481. Stratton prepared TV dinners. He did not clean often. R. 481-82. He did not shower every day, due to fatigue. R. 77. Pain interfered with his sleep. R. 78. He could walk short distances, and briefly stand or sit. He could not bend, lift, kneel or climb stairs. He needed multiple reminders in order to complete a task. R. 82.

Ruth Stratton, Stratton's mother, submitted a Function Report. She indicated that Stratton's problems were due to cancer treatment he received. R. 95. She wrote that Stratton tried to learn new computer skills, watched television, read books, used the computer, and ate pre-made meals during the day. R. 88. He could not sit, stand, or move without pain and had no strength or stamina. His sleep was disrupted because of pain. R.

89. After taking a shower, he had to rest before getting dressed. R. 88. He completed minimal housework monthly. He did his own laundry but it took hours to put it away because he had to rest. R. 90. He could take a shower but then had to rest before getting dressed. She indicated his memory was getting worse. R. 92. Stratton had anger issues and depression, and his bipolar disorder made it hard for him to socialize. He also had shaking and tremors which affected the use of his hands. He could only pay attention for 10-15 minutes and had difficulty concentrating due to his pain and medications. R. 93. He had bone problems, high blood pressure, high cholesterol, pain, and endocrine system problems. R. 95.

### B.   Vocational Expert Testimony.

The VE testified that Stratton's prior position as a technical support specialist would be DOT number 033.162-018, a skilled, light work position but performed at the sedentary level, with an SVP of 7. R. 484. The job most analogous to Stratton's web designer position was programmar analyst, DOT number 030.162-014, a skilled sedentary position with an SVP of 7. R. 484. Stratton's position as a Walmart electronics salesperson could be either a sales person-stereo equipment or a sales person-household appliances under the DOT. R. 484-85. The VE used the position of sales clerk, DOT number 290.477-014, a semi-skilled, light work position with an SVP of 3, but the VE would raise the SVP level to 4 to correlate to the salesperson-stereo/household appliances. The VE found that this job required a light level of exertion, despite the absence of lifting, because Statton was on his

feet most of the time. R. 485. The ALJ did not pose a hypothetical question to the VE about other work Stratton could perform.

C.    *Medical Records.*

In a letter dated July 16, 2001, Narayan R. Shah, M.D., summarized Stratton's treatment as a child for acute lymphoblastic leukemia (ALL), including chemotherapy and radiation. R. 456-57. Complications of that treatment included neurotoxicity which resulted in arthroscopic surgery on the left knee in 1997 and 1999. A neuropsychological evaluation was performed because of short-term memory loss and tests were within or above normal limits but did show some subtle memory deficits. R. 456. Dr. Shaw advised that Stratton might have future medical problems because of his cancer treatment, including cataracts, memory loss, liver function problems, bladder cancer, bone marrow dysfunction, and weakening of the heart muscle. R. 456-57.

On June 27, 2002, Stratton was treated at Fish Memorial Hospital in the emergency room for right wrist pain from pushing hard on a car door. R. 123-25. He was working at Western Outfitters at the time and was taken off work for one day and put on light duty for 14 days. R. 123. His wrist was not fractured. R. 126.

On December 12, 2002, Maha Ansara, M.D., examined Stratton at the request of Carlos Dominguez, M.D. Stratton complained of heat and cold intolerance, increasing fatigue, difficulty concentration and sleeping and occasional neck pressure and blurred vision. R. 146. Dr. Ansara's assessment was hypogonadism (low testosterone) and subclincal hypothyroidism (insufficient thyroid hormone). R. 147.

On October 14, 2003, Jay Adcock, M.D., x-rayed Stratton's back due to complaints of lower back pain. The x-rays revealed normal curvature and alignment. The x-rays showed narrowing of the L3-4 and L4-5 disc spaces and moderate degenerative changes. R. 138. An MRI taken on November 5, 2003, indicated there was no disc protrusion, central canal stenosis, or foraminal narrowing throughout the cervical spine. R. 139. A cervical spine series and thoracic spine series were normal. A lumbosacral spine series showed narrowing of disc spaces at L2-3 through L4-5 with degenerative changes anteriorly throughout the lumbar spine with the most marked changes in L3. R. 140.

Stratton treated with Carlos Dominguez, M.D., on January 27, 2004. Stratton complained of extremity numbness, heartburn, sleep apnea, as well as shoulder, neck, and back pain. He was noted to have a poor diet. Dr. Dominguez's assessment included cervical radiculopathy, rule out lumbar radiculopathy,and gastroesophageal reflux disease (GERD). R. 136. On February 24, 2004, Stratton again complained of back pain. Dr. Dominguez noted that a lumbar MRI revealed advanced degenerative disc disease with disc bulging. He referred Stratton to an orthopaedist. R. 135.

On April 1, 2004, Stephen M. Reed, M.D., an orthopaedist, evaluated Stratton. R. 174-75. Stratton complained of back pain after a car accident in the fall of 2003. He had discontinued therapy and wanted to begin an exercise program. R. 175. X-rays showed fairly significant disc space narrowing with disc changes throughout the lumbar spine. An MRI showed migration of the discs into the vertebral bodies (Schmorl's nodes). Dr. Reed recommended an exercise program and prescribed a trial of Ultracet. R. 174.

Stratton followed-up with Dr. Reed on May 27, 2004 complaining of neck, arm, back, and knee pain with numbness and tingling in his arm. Leg raising tests were negative for true radicular complaints. Dr. Reed's impression was cervical and lumbar strain syndrome, degenerative disc disease, lumbar spine, carpal tunnel syndrome, and knee pain. R. 173.

Stratton treated with Dr. Reed again on October 5, 2004, and complained that his numbness was worsening, and he had neck and back pain. He was more fatigued. He had good leg range of motion. Dr. Reed's impression was cervical strain and carpal tunnel syndrome with radiculopathy. Dr. Reed recommended additional neurological tests. R. 171.

On October 13, 2004, Stratton was evaluated by Glenn I. Kolluri, M.D., a neurologist, for arm and leg pain. R. 167-69, 428-30. Stratton complained of pain shooting down his arms and legs from his neck and low back, as well as spasms, numbness and tingling without nausea or vomiting. R. 167, 428. Stratton reported that his pain had increased after being in a car accident in 2003. Dr. Kolluri catalogued Stratton's treatment for cancer and noted that Stratton appeared to have side effects of long-term steroid use with bone loss. He observed that Stratton's gait was unremarkable. Dr. Kolluri also observed decreased sensation in Stratton's extremities. R. 168, 429.

On November 23, 2004, Stratton complained to Dr. Kolluri of "on-and-off" pain in his back and legs. R. 163, 435. Nerve conduction studies were unremarkable as was an EMG of all four extremities. R. 163-66, 431-35. An MRI revealed degenerative disease in the low back as well as degeneration of some of the vertebral bodies. Dr. Kolluri prescribed Imitrex, Bextra for inflammation, recommended continuation with physical therapy, stretching

exercises, heat and ice, and whirlpool.  R. 163, 435.  Dr. Kolluri noted that Stratton was "doing well."  *Id.*

Stratton treated with Dr. Reed on December 9, 2004.  He complained of fatigue with aching pain and discomfort in his neck, back, arms, and legs.  Upon examination, Dr. Reed noted some decreased power and strength.  His impression was cervical and lumbar spondylosis and neuropathy.  R. 170.

Stratton began treating with the Florida Department of Health in April 2005.  R. 215, 287, 301.  The medical notes reflect diagnoses of leukemia, hypothyroidism, depression and anxiety, chronic pain syndrome, bipolar disorder, obesity and an abnormal liver.  *See* R. 210. Stratton was taking several medications, including Wellbutrin (a prescription antidepressant), Effexor (a prescription antidepressant), Zyprexa (a prescription antipsychotic medication), and Sonata (a prescription medication used to treat insomnia).  R. 287, 301.

Alvan Barber, M.D., completed an Independent Medical Evaluation on July 19, 2005. R. 258-65.  Stratton told Dr. Barber that he last worked in April 2005.  R. 259.  Upon examination, Dr. Barber observed that muscle strength and sensation were normal in Stratton's arms and hands, but he had decreased range of motion due to pain, tight muscles and obesity.  He had positive Phelan's[5] and Tinel's[6] signs, more on the right than the left.

---

[5] "The reproduction of the symptoms of carpal tunnel syndrome by hyperflexing the wrist." *Casher v. Halter*, No. Civ.A. 00-0110-AH-L, 2001 WL 394921, at *5 n.4 (S.D. Ala., Mar. 29, 2001).

[6] Tinel's sign is "a sensation of tingling, or of 'pins and needles,' felt in the distal extremity of a limb when percussion is made over the site of an injured nerve; it indicates a partial lesion or early regeneration in the nerve." STEDMAN'S MEDICAL DICTIONARY 1619

R. 260. He observed some numbness and tingling in Stratton's toes, more on the right than the left. Muscle strength in the legs was normal. He had decreased range of motion in his legs due to pain, tight muscles and obesity. He also had decreased range of motion in his back without spasms. Straight leg raising tests were positive for pain. He walked without difficulty and without a limp, and was able to walk on his toes and heels. Dr. Barber found no evidence of depression. R. 260-61.

Dr. Barber's impression was: bipolar disorder with depression predominance, not on medications[7]; cervical degenerative disc disease (DDD) with spondylosis with right and left upper extremity radiculopathy with chronic pain; lumbar DDD with spondylosis with right and left lower extremity radiculopathy with chronic pain; arthralgia greater in the left than right knee, right hip; right greater than left carpal tunnel impingement; history of hypothyroidism, not on medications; left greater than right knee degenerative joint disease (DJD), post bilateral surgery, with chronic pain; history of asthma; history of ALL in childhood with radiation and chemotherapy treatment; obesity; and tobacco abuse. R. 261. Dr. Barber noted Stratton "could be" limited in walking and standing for long periods of time because of obesity and decreased range of motion, and "could be" limited in lifting and carrying heavy objects. *Id.* Dr. Barber noted that Stratton was obese and his symptoms were possibly perpetuated by excessive weight. *Id.*

---

(26th ed. 1995). A positive Tinel's sign is one indicator of carpal tunnel syndrome. *See Boone v. Apfel*, No. CIV.A. 98-1131-P-S, 2000 WL 284280, at * 3 (S.D. Ala. Mar. 1, 2000)

[7] Stratton told Dr. Barber that he could not afford medication. R. 258.

Stratton complained to the Florida Department of Health of back pain and an inability to bend on September 14, 2005.  R. 298.  Stratton was assessed with obesity, chronic pain syndrome, hypothyroidism, and depression/anxiety/possible bipolar disorder.  R. 214, 298.

Dr. Barber completed another Independent Medical Evaluation of Stratton on February 28, 2006.  R. 250-57.  At that time, Stratton weighed 262 pounds.  R. 252.  Stratton again indicated that he had last worked in April 2005.  R. 251.  Dr. Barber noted Stratton's vision with glasses was 20/40 in the right eye, 20/40 in the left eye, and 20/30 together.  He had decreased range of motion in his neck due to pain and tight muscles.  He was obese. He had decreased range of motion in his arms, legs, and back due to pain, tight muscles, and obesity.  R. 252.   Dr. Barber noted no evidence of depression and adequate cognitive functioning.  Dr. Barber also noted that Stratton walked without difficulty, walked without a limp, and was able to walk on his toes and heels.  R. 253.

Dr. Barber's impression was: bipolar disorder with depression predominance, elects not to take medications; cervical DDD with spondylosis with right and left upper extremity radiculopathy with chronic pain; lumbar DDD with spondylosis with right and left lower extremity radiculopathy with chronic pain; arthralgia greater in the left than right knee, right hip, with chronic pain; right greater than left carpal tunnel impingement; history of hypothyroidism, not on medications; left greater than right knee degenerative joint disease, post bilateral surgery, with chronic pain; history of asthma, on medications; history of ALL in childhood with radiation and chemotherapy treatment; history of liver problems; and obesity.  R. 253.  Dr. Barber again indicated that Stratton "could be" limited in walking and

standing for long periods of time because of obesity and decreased range of motion due to pain and tight muscles. R. 254. Dr. Barber also noted Stratton "could be" limited in lifting and carrying heavy objects and that Stratton was obese and his symptoms could be perpetuated by excessive weight. *Id.*

Notes dated March 3, 2006 from the Florida Department of Health indicate that Stratton complained of pain in his right eye, headaches, fatigue, constant diarrhea, and vomiting three times per day. He also had pain in his left hand and right arm, neck pain, and difficulty breathing at night. R. 294. He also complained of pain under his ribs every 1 to 2 days which would last for 1 to 2 hours. R. 293.

On May 9, 2006, Stratton was treated by Bharat C. Patel, M.D. He weighed 256 pounds. R. 337. He complained of GERD, nausea and vomiting on an intermittent basis, and loose stools. He had "off and on" migraine headaches and joint pain. R. 336, 417. On May 16, 2007, tests showed esophageal erosion and gastritis. R. 335, 416.

Stratton presented to the emergency room complaining of vision loss in his left eye and a headache on June 18, 2007. A CT scan performed for evaluation of headache with visual loss was normal. R. 441; *see also* R. 291, 355.

Jeffrey S. Corak, M.D., a neurologist, evaluated Stratton on July 30, 2007. R. 331-32, 436-37. Stratton complained that 3 to 4 weeks prior he developed a headache and the next day he lost 40-50% of the vision in his left eye. He denied nausea and vomiting. R. 331, 436. Dr. Corak observed that Stratton's gait was normal. R. 332, 437. The MRI of the brain and orbits revealed no abnormality. R. 439-40. Dr. Corak indicated there was no neurologic

reason for the loss of vision. Stratton also reported headaches with nausea, vomiting, photophobia and phonophobia which had been treated effectively with Imitrex. His Imitrex prescription was renewed. R. 411, 438.

On September 10, 2007, Stratton complained to the Florida Department of Health of stomach problems, diarrhea, pain in his knees, hip, hand, neck, back, vomiting, not sleeping, and not being able to concentrate. R. 353. Salvador Gallardo, M.D., interpreted x-rays of Stratton's spine as essentially normal. R. 390-93. X-rays of the pelvis and hips showed marked osteopenia (low bone mineral density). R. 394-95. Knee x-rays showed advanced degenerative changes with osteopenia. R. 396-98.

On October 4, 2007, Stratton complained to Dr. Patel of vomiting on a daily basis, as well as heartburn and diarrhea. R. 403. His weight was 235.5 pounds. R. 403. Upon examination, Dr. Patel noted no limitations or pain on joint motion and no spinal tenderness. Muscle strength and sensory examinations were normal. R. 404. Stratton was scheduled for an esophagogastroduodenoscopy and a colonoscopy. R. 404. The results of those tests are not in the record.

On February 25, 2008, Kristopher Barberio, D.C., performed a final evaluation of Stratton. R. 442-47. Stratton described the intensity of his headaches as a 3 on a scale of 1 to 10, with 10 being the highest level of pain. R. 442. These were moderate, inhibited activity, and occurred 50% - 80% of the time. *Id.* His neck pain rated 8 out of 10, occurred 80% - 100% of the time, and inhibited activity. This pain radiated to both hands. His mid back pain rated 8 out of 10, inhibited activity, and occurred 80% - 100% of the time. His

lower back pain rated 8 out of 10, inhibited activity, and occurred 50% - 80% of the time. *Id.* Pain in the buttocks that radiated to the thighs was rated as 5 out of 10, inhibited activity, and occurred 80% - 100% of the time. R. 442-43. His gait was normal. R. 443. Barberio noted that the prognosis for Stratton was favorable, although he might experience exacerbations from time to time. R. 447.

      D.    *Psychiatric Records.*

Psychiatric records from Adly Thebaud, M.D., and J.A. Flanagan, A.R.N.P., dated September 24, 2004 through May 2, 2005, show that Stratton was treated 5 times. R. 178-86. Initially, Stratton was noted to be depressed and was on Effexor, Zyprexa, and Wellbutrin. R. 179. On May 2, 2005, Stratton indicated that he had quit his job due to physical and emotional pressure. Stratton indicated that he was less depressed and that he felt ready to go back to work. R. 180.

Stratton treated with counselors at "The House Next Door" on a weekly basis from October 11, 2005 through December 5, 2005. A note from his counselor indicated that Stratton had trouble getting from a sitting to a standing position. He seemed tired, complained of persistent nausea, and expressed sadness and grief over his physical decline which had affected his ability to concentrate and sleep. Stratton was making minimal progress in therapy and reported that his pain and depressed mood affected his ability to function well in many areas. She recommended cognitive-behavioral techniques, relaxation training, pain management, and medical referrals. R. 228.

On February 4, 2006, N. Kirmani, M.D., performed a psychiatric evaluation at the request of the State Division of Disability Determinations. R. 229-31. Dr. Kirmani stated that no particular abnormalities of gait or posture were noted. R. 229. Stratton described trouble sleeping due to pain. R. 229-30. He could perform household chores such as cleaning, laundry, and taking out the trash, buy groceries and prepare meals for himself. He spent the day working on the computer or watching television. R. 229. Stratton was able to take care of his personal grooming. R. 230. No intellectual deterioration was identified, and Stratton's insight was adequate and his judgment intact. Stratton was able to make personal and social adjustments and had the capacity to understand, remember, and carry out instructions. He could manage funds. Dr. Kirmani diagnosed a depressive disorder, not otherwise specified, by history. R. 231.

E.      Reviewing Professionals.

Gary W. Buffone, Ph.D., a clinical psychologist, completed a Psychiatric Review Technique form on May 28, 2005. R. 187-200. Dr. Buffone found that Stratton had a major depressive disorder, which was not a severe impairment. R. 190. Stratton had mild restrictions on activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. R. 197.

Elizabeth Baez-Beaty, M.D., completed a Physical Residual Functional Capacity Assessment on July 26, 2005. R. 201-08. She found Stratton could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk and sit about 6 hours in an 8-hour workday, and perform unlimited pushing and pulling. R. 202. Stratton could frequently

balance; occasionally climb ramps/stairs, stoop, kneel, crouch, crawl; and should never climb ladder/rope/scaffolds. R. 203. He should avoid concentrated exposure to humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. R. 205. She reviewed records from treating physicians in making her assessment. R. 207.

On February 20, 2006, Val Bee, Psy.D., completed a Psychiatric Review Technique form after review of Stratton's records. R. 232-49. Dr. Bee noted that Stratton had been diagnosed with bipolar disorder "but symptoms appear to primarily involve depression associated with chronic pain." R. 244. Dr. Bee found Stratton had mild limitations on activities of daily living and maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace due to pain and stamina. R. 242, 244. Dr. Bee also noted a moderate limitation on the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 246-47.

Eric Puestow, M.D., completed a Physical Residual Functional Capacity Assessment on March 8, 2006. R. 266-73. Dr. Puestow found Stratton could lift 50 pounds occasionally, 25 pounds frequently, could stand and/or walk and sit about 6 hours in an 8-hour workday, and could perform unlimited pushing and/or pulling with his upper extremities, but could not perform repetitive motion. R. 267. He should avoid concentrated exposure to vibration. R. 270.

*F. Vocational Evaluation.*

On November 8, 2005, Elaine Harger completed a vocational evaluation. R. 274-83. Stratton tested above a 12th grade level in reading, applied math, and language. He tested above an 8th grade level in total math. R. 278. Ms. Harger found Stratton did not appear physically able to return full-time to his previous occupations. R. 282. She recommended several jobs within his interests and abilities, including customer service help line, telephone survey taker, advertising layout designer, and graphic artist. R. 282.

## IV.  STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A),l 1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3),1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (per curiam).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d

1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## V.     ANALYSIS.

Stratton asserts four grounds supporting reversal.  First, he asserts that the ALJ improperly rejected his testimony regarding his physical limitations and limitations arising from pain and other subjective symptoms. Stratton asserts that the ALJ failed to consider evidence regarding his inability to be substantially and gainfully employed.  Stratton also submitted that the ALJ improperly relied on the testimony of the VE in finding that he was capable of performing the full range of light work.  Finally, Stratton alleges the ALJ failed to consider his impairments in combination.  These are the only issues I will address.[8]

### A.     *Credibility.*

In evaluating the functional limitations arising from pain and other subjective symptoms, an ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. §§ 404.1528, 416.928.

_____

[8] The parties were advised that issues not specifically raised would be waived. Doc. No. 11.

In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote v. Chater*, 67 F.3d 1553, 1560-61 (11th Cir. 1995) (per curiam) (*quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam)).

When an ALJ decides not to credit a claimant's testimony about pain and other subjective symptoms, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (per curiam) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

The ALJ correctly applied the pain standard. He found that Stratton's medically determinable impairments could be reasonably expected to produce the alleged limitations, but he concluded that Stratton's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent inconsistent with the ALJ's RFC finding. The ALJ articulated specific reasons for his findings, as follows:

> The claimant's statement [to Dr. Barber] that he had not worked since April 2005 is inconsistent with his testimony, as well as the earnings record, which raises a question as to his credibility. Was he truthful with Dr. Barber concerning his symptoms and their alleged impact on his physical capacity or did he exaggerate? He said he had difficulty walking due to bone spurs in his feet and back, but his gait was normal and there was no examination evidence of bone spurs in his back or feet. He was diagnosed with bipolar disorder and hypothyroidism, but . . . he was taking no medication for these disorders. . . . Dr. Corack's assessment of [t]he claimant's visual problem was that an MRI of the brain and orbits had been normal and the etiology of his vision complaint was not clear . . . . [T]he claimant reported that he was working at Wal-Mart as a sales clerk, which . . . shows that he continued to work despite the eye problem. . . . Significantly, Dr. Patel's October 2007 examination revealed that the claimant had lost 25 pounds, down from 260 to 235 pounds, from the time of his examination by Dr. Barber. Dr. Patel stated there was no loss of motion in claimant's spine or joints, which tends to support the probability that claimant's prior weight of 260 pounds directly impacted his musculoskeletal symptoms. . . . Considering the evidence of record and the claimant's testimony that he was working 7 hours per day, 3 days per week, the undersigned concludes that the evidence shows that the claimant's impairments do not preclude light exertion.

R. 33-34.

Without consideration of the ALJ's reference to Stratton not taking medication[9], substantial evidence supports the ALJ's findings, as reflected in the summary of the medical records provided above. These reasons are adequate to support the ALJ's credibility finding.

---

[9] Stratton testified that he could not afford medications. Because poverty will generally excuse noncompliance with prescribed treatment, if the ALJ relied on noncompliance as the sole ground for denial of benefits, he must determine whether the claimant was able to afford the treatment. *Dawkins v. Bowen*, 848 F.2d 1211, 1213-14 (11th Cir. 1988).

*B.      Substantial Gainful Activity.*

The ALJ also considered whether Stratton could engage in substantial gainful activity.

For purposes of a step 4 analysis of whether Stratton could return to his past relevant work,

social security ruling 96-8p provides as follows:

> The ability to work 8 hours a day for 5 days a week is not always required
> when evaluating an individual's ability to do past relevant work at step 4 of the
> sequential evaluation process. Part-time work that was substantial gainful
> activity, performed within the past 15 years, and lasted long enough for the
> person to learn to do it constitutes past relevant work, and an individual who
> retains the RFC to perform such work must be found not disabled.

SSR 96-8p, 1996 WL 374184, at * 2 n. 2.

The ALJ noted that Stratton worked on a sustained basis after the disability onset

date, albeit part-time, at step 1 of the sequential evaluation.  R. 24.  In an abundance of

caution, however, the ALJ elected to proceed with the sequential evaluation process.

Substantial evidence in the record supports the ALJ finding that Stratton performed

substantial gainful activity after the disability onset date based on earnings records alone.

Therefore, the ALJ did not err with respect to his finding that Stratton could perform his past

relevant work, which was substantial gainful activity.

*C.      Improper Reliance on VE Testimony.*

Stratton contends that the hypothetical questions asked of the VE did not include his

nonexertional impairments and specifically did not include Stratton's complaints of being

extremely fatigued after working three days per week.  When an ALJ concludes that a

claimant can return to his past relevant work, it is not necessary to ask a VE to opine about

whether the claimant could still perform that work.  *See Lucas v. Sullivan*, 918 F.2d at 1567, 1573 n. 2 (11th Cir. 1990).  Therefore, there was no need for the ALJ to pose hypothetical questions to the VE listing Stratton's functional limitations.

An ALJ is permitted to rely on evidence from a VE to determine the demands of Stratton's past relevant work.  20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2). In this case, the ALJ merely inquired into the classification of Stratton's past jobs.   As such, there was no error in the ALJ's reliance on the testimony of the VE.

Dr. Barber discussed Stratton's ability to work and stated that Stratton "could" be limited in walking and standing and "could" be limited in lifting and carrying heavy objects. R. 261.  However, those general restrictions have not prevented Stratton from continuing to perform substantial gainful activity, albeit part time.

Stratton also alleges that the ALJ failed to consider the testimony of Stratton's mother. The Function Report prepared by Ruth Stratton largely corroborated Stratton's complaints, which were evaluated by the ALJ.  Therefore, the ALJ has considered the substance of Ruth Stratton's report, despite not referencing it specifically.

*D.  Combination of Impairments.*

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having severe hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the

ALJ must make specific and well-articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled. *Id.*, 985 F.2d at 534.

The ALJ must consider each alleged impairment and "state the weight accorded [to] each item of impairment evidence and the reasons for his decisions on such evidence." *Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986). In addition, the ALJ must explain whether the impairments are severe singularly and in combination. *Id.* The combined effect of impairments must be considered even if any of the impairments considered separately are not "severe." *Hudson v. Heckler*, 755 F.2d 781, 785-786 (11th Cir. 1985). A statement by the ALJ that the combined effect of a plaintiff's impairments does not render him or her disabled is sufficient to show that the ALJ addressed the impairments in combination. *Jones v. Dep't of Health & Human Serv's*, 941 F.2d 1529, 1533 (11th Cir. 1991); *Wheeler v. Heckler*, 784 F.2d 1073, 1076 (11th Cir. 1986).

The ALJ decision reflects a careful consideration of the record as a whole. As discussed above, the ALJ properly applied the pain standard, stated explicit and adequate reasons for finding Stratton's testimony about his functional limitations to be not entirely credible, and made appropriate findings about Stratton's ability to perform his past relevant work. Accordingly, the ALJ did not err by failing to consider Stratton's combination of impairments.

## VI.     RECOMMENDATION.

For the reasons set forth herein, it is **RESPECTFULLY RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**. I further recommend that the Court direct the

Clerk of Court to issue a judgment consistent with its order on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended this 3d day of February 2010.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy